UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAWN SLAUGHTER                    :
                                  :CIVIL ACTION NO. 3:17-CV-1788
          Plaintiff,              :
                                  :(JUDGE CONABOY)
          v.                      :
                                  :
NANCY A. BERRYHILL,               :
Acting Commissioner of            :
Social Security,                  :
                                  :
          Defendant.              :
                                  :

_____

## MEMORANDUM

Pending before the Court is Plaintiff's appeal from the
Commissioner's denial of Disability Insurance Benefits ("DIB")
under Title II of the Social Security Act ("Act") and Supplemental
Security Income ("SSI") under Title XVI of the Act.  (Doc. 1.)
Plaintiff protectively filed applications on October 25, 2013,
alleging disability beginning on April 1, 2010.  (R. 10.)  Based on
a determination that part of the period was previously adjudicated,
Administrative Law Judge ("ALJ") Scott M. Staller considered only
the period beginning May 23, 2012.  (R. 10-11.)  After Plaintiff
appealed the initial June 30, 2014, denial of the claims, a hearing
was held on January 26, 2016.  (R. 35-61.)  ALJ Staller issued his
Decision on March 29, 2016, concluding that Plaintiff had not been
under a disability, as defined in the Social Security Act ("Act")
through the date of the decision.  (R. 24.)  Plaintiff requested
review of the ALJ's decision which the Appeals Council denied on
September 13, 2017.  (R. 1-6.)  In doing so, the ALJ's decision

became the decision of the Acting Commissioner.  (R. 1.)
Plaintiff filed this action on October 2, 2017.  (Doc. 1.)  She
asserts in her supporting brief that the Acting Commissioner's
determination is error for the following reasons: 1) the ALJ did
not properly evaluate the opinion of the consulting psychologist;
2) substantial evidence does not support the ALJ's RFC assessment;
and 3) the ALJ made multiple errors in evaluating Plaintiff's
symptoms.  (Doc. 9 at 1-2.)  For the reasons discussed below, the
Court concludes Plaintiff's appeal is properly granted in part.

## I. Background

Plaintiff was born on December 21, 1971.  (R. 22.)  She has a
limited education and past relevant work as a home health aide.
(*Id.*)  Plaintiff alleged that her inability to work was limited by
bulging discs, diabetes, depression, arthritis, and muscle spasms.
(R. 269.)

### A. *Medical Evidence*[1]

### 1.  Physical Impairments

A lumbar MRI from March 2010 showed "posterior disc bulge with
more focal left paracentral protrusion resulting in mild to
moderate central canal narrowing at L4-L5."  (R. 402.)  The
Pinnacle Health System Emergency Department physician also noted
"[t]here is probably very mild mass effect on the bilateral L5

---

[1]  The following review focuses on those impairments and
evidence related to Plaintiff's claimed errors.

2

nerve roots." (*Id.*)

In November 2011, Plaintiff when to Pinnacle Health's Harrisburg Campus Emergency Department with mid back pain that radiated down her right side. (R. 395.) She reported that it started a year earlier but had gotten worse. (Id.) Plaintiff also said she had numbness and tingling down both legs. (*Id.*) Physical examination of the back showed normal range of motion, tenderness midline to lower back, straight leg raise without pain on the left, and straight leg raise with pain on the right at thirty degrees. (R. 397.) Patient was diagnosed with low back pain and discharged with the tingling in her leg and pressure in her back completely resolved. (R. 397.)

On March 8, 2012, Lauren N. Welsh, M.D., and Vitaly Gordin, M.D., of the Penn State Milton S. Hershey Medical Center evaluated Plaintiff for low back pain at the request of Arthur Williams, M.D., Plaintiff's primary care provider. (R. 326-28.) By history, Dr. Welsh noted that Plaintiff continued to suffer from back problems which began in on March 4, 2010, when she was vacuuming at her job and she had some severe low back pain, weakness, and urinary incontinence. (R. 326.) Plaintiff rated her pain at 7/10 and described it as throbbing in the middle of her back and shooting down the back or her legs into her feet with numbness and tingling in both legs and weakness with the onset of pain. (R. 326-27.) Dr. Welsh added that Plaintiff had no incontinence since

3

the March 2010 event, respositioning helped alleviate the pain, medications (Flexeril, Naproxen and Tylenol) helped minimally alleviate the pain, she had trouble sleeping due to pain, she had lower back muscle spasms three to four times a week, and her pain was in the lumbar and lower thoracic areas. (R. 327.) Physical examination showed that Plaintiff had 5/5 upper and lower extremity strength bilaterally, normal muscle mass and tone, reflexes were minimal to none but equal bilaterally, muscle strength was equal everywhere except for right weakness flexing her right thigh, and straight leg raise was positive on the left. (*Id.*) Plaintiff was diagnosed with lumbar spondylosis with lumbar radiculopathy and lumbar epidural injections were planned. (*Id.*) Plaintiff received L5-S1 left paramedian epidural steroid injections on March 19, 2012. (R. 339.)

On May 24, 2012, Dr. Vitaly noted that Plaintiff reported reasonable improvement of her symptoms and rated her pain at 5/10. (R. 339.) Plaintiff also reported that her pain worsened with kneeling or stooping. (*Id.*) Physical examination showed that Plaintiff's gait was guarded, she had mild weakness in her left leg with 4+/5 motor strength with knee extension and dorsiflexion of the left foot drop, and straight leg raising was mildly positive on the left side. (*Id.*) Dr. Vitaly noted that Plaintiff would be scheduled for steroid injections. (*Id.*)

In August 2012, Plaintiff reported to Dr. Vitaly that the

4

injection provided her with reasonable pain relief in the midportion of her spine and she had much less pain above the waistline but she complained of pain in the lumbosacral junction that radiated to the posterior aspect of her thighs which she rated at 6/10. (R. 337.) Dr. Vitaly noted that Plaintiff became tearful when describing how the pain affected her quality of life. (*Id.*) Physical examination showed that straight leg raising was mildly positive on the left side in sitting position with extension of the leg at 90 degrees and foot dorsiflexion. (*Id.*) Examination also showed that palpation of the lumbar facet joints at L4-5 and L5-S1 was associated with pain that reproduced Plaintiff's symptoms on both sides. (*Id.*) Dr. Vitaly planned to schedule a lumbar facet joint injection. (R. 338.)

A cervical x-ray dated October 12, 2012, showed a very mild degree of degenerative change at the C5-C6 level. (R. 429.)

Dr. Vitaly saw Plaintiff again on November 2, 2012. (R. 332.) Plaintiff reported that she had experienced left-sided numbness after her October 5, 2012, injection and fell twenty-four to forty-eight hours after the injection at which time she went to Harrisburg Hospital and was diagnosed with hypertension. (*Id.*) Plaintiff said the hospital experience, including a lumbar puncture, caused increased pain and anxiety. (*Id.*) Physical examination showed decreased range of motion in the lumbosacral region. (*Id.*)

In January 2013, Plaintiff saw her Hamilton Health Center primary care provider, Dr. Willaims, for migraines and back pain. (R. 353-54.)  His plan was for Plaintiff to consult with an orthopedic specialist and pain management specialist for her back and sciatic pain.  (R. 354.)  Dr. Williams continued to assess Plaintiff with "backache" through August 2013 and found that she had a decreased range of motion in her lower back.  (R. 350-52.)

On November 2013, Plaintiff went by ambulance to the Pinnacle Health Emergency Department because of an acute exacerbation of low back pain associated with some numbness and tingling.  (R. 371.) Physical examination showed that Plaintiff had lumbar paraspinal muscle spasm and flat, anxious affect.  (*Id.*)  Doctor Notes indicated that computerized tomography of her back showed bulging discs at several levels and moderate spinal stenosis without critical narrowing.  (R. 372.)  Follow up with primary care and treatment for depression were recommended.  (R. 373.)  The impression recorded of the CT of the lumbar spine was no acute lumbar spine abnormality, disc bulges at L4-L5 and L5-S1 resulting in moderate central canal stenosis, with minimal bilateral neuroforaminal stenosis present at L4-L5.  (R. 417.)

Hua Yang, M.D., performed an internal medicine examination on May 1, 2014, at the request of the Bureau of Disability Determination.  (R. 484-87.)  He noted that Plaintiff was unaccompanied and she presented with the chief complaint of lower

6

back pain which she reported was slightly improved but she developed numbness and tingling on the left side of her body. (R. 484.) Dr. Yang recorded the following additional information related by Plaintiff:

> Currently, she describes lower back pain as intermittent, stabbing and pressure in nature, rated at 10 to 20 of 10. Any position can trigger pain. The medication helps to relieve the pain. The pain sometimes radiates up to the left arm and both lower legs. She also reported she has intermittent muscle spasm in the lower back. Averagely, she has two three spells per week, and each spell lasting one hour. There are no clear trigger factors. Naproxen and cyclobenzaprine help to relieve the symptoms. The last spell was three days ago. She fell a couple times, and she started using the cane since 2012, per her doctor. The last fall was in 09/13.

(R. 484.) Regarding her mental health, Dr. Yang noted that Plaintiff reported depression and anxiety since 2012, she had constant thoughts of suicide, but not homicide, she denied suicidal or homicidal ideation at the time, and her primary care doctor prescribed medication for her. (R. 484-85.) He also referred her to a psychiatrist with whom she had an appointment the following month. (R. 485.) Regarding activities of daily living, Plaintiff reported that she lived by herself, she cooked two to three times a week, her friend helped her do housework, she showered and dressed herself daily with some assistance, and her activities included watching TV, listening to the radio, and reading. (R. 485.) Dr. Yang made the following findings:

> GENERAL APPEARANCE, GAIT, STATION: She is
> right handed. The claimant appeared to be in
> no acute distress. Gait is slightly unstable
> without cane. She is not able to walk on
> heels and toes. She is unable to squat.
> Stance normal. With a cane, she walks stable.
> Needed no help changing for exam or getting
> on and off exam table. Able to rise from
> chair without difficulty.
>
> MUSCULOSKELETAL: No scoliosis, kyphosis, or
> abnormality in thoracic spine. SLR of
> bilateral legs to 30 degrees in lying
> position and sitting position. There is
> decreased ROM in the hip and the left
> shoulder. No evident joint deformity. Joints
> stable and nontender. No redness, heat, or
> effusion.
>
> MENTAL STATUS SCREEN: The claimant dressed
> appropriately, maintained good eye contact,
> and appeared oriented in all spheres. No
> evidence of hallucinations or delusions. No
> evidence of impaired judgment or significant
> memory impairment. Affect normal. The
> claimant denied suicidal ideation.

(R. 486-87.)  Dr. Yang diagnosed lower back pain, history of depression and anxiety, history of hypertension, and history of type 2 diabetes.  (R. 487.)  He found Plaintiff's prognosis to be fair.  (*Id.*)

On the same date, Dr. Yang completed a Medical Source Statement to Do Work-Related Activities (Physical).  (R. 488-93.) He opined that Plaintiff could lift or carry up to ten pounds occasionally and never lift over that.  (R. 488.)  He found that Plaintiff could sit for two hours and stand/walk for one hour at a time without interruption and she could sit for a total of eight hours and stand/walk for a total of three hours in an eight-hour

day.  (R. 489.)  He noted that a cane was medically necessary and Plaintiff could use her free hand to carry small objects.  (R. 489.)  Dr. Wang reported that Plaintiff could use her right hand continuously and with her left hand she was limited to frequent reaching.  (R. 490.)  He concluded that Plaintiff could never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl, but she could occasionally climb stairs and ramps.  (R. 491.)  Finally, Dr. Wang opined that Plaintiff could never be exposed to unprotected heights or moving mechanical parts and she could occasionally operate a motor vehicle.  (R. 492.)  He noted that all limitations were due to low back pain.  (R. 489-92.)

Plaintiff had several primary care visits at Hamilton Health Center from June 2014 through December 2015.  She saw Dr. Williams through October 2014 and he regularly found tenderness on palpation of her middle and/or lower back.  (R. 523-27.)  At the October 15, 2014 visit, Dr. Williams noted that Plaintiff was extremely upset because she could not get narcotics secondary to marijuana in her urine.  (R. 523.)  In December 2014, Plaintiff saw Burhanuddin Farooqi, M.D., as her primary care provider.  (R 521-22.)  He noted that Plaintiff sought medication refills and wanted a prescription for a back brace.  (R. 521.)  He found slight tenderness to palpation over the mid lower back and recommended a physical therapy consultation.  (R. 522.)

Plaintiff had a physical therapy evaluation at Drayer on

February 12, 2015, at which moderate difficulty standing and severe difficulties sleeping, traveling, lifting, and walking were noted. (R. 517.)  Clinical Assessment indicated that Plaintiff had limited mobility due to low back pain and she had lower extremity radicular symptoms.  (*Id.*)  The Problem List included pain, decreased strength, decreased range of motion, decreased mobility, and decreased function.  (*Id.*)  The evaluator further noted severe limitations with sidebending and rotation, tenderness to palpation over the paraspinals and vertebrae, and Plaintiff ambulated with trunk rotation and pelvic list.  (R. 518.)

In March 2015, Dr. Farooqi recorded that Plaintiff reported no acute medical complaints.  (R. 521.)  Dr. Farooqi assessed lower back pain through December 30, 2015, but he did not record related physical examination findings.  (*See* R. 563-66.)

Michael Fernandez, M.D., of the Orthopedic Institute of Pennsylvania conducted a spinal evaluation on March 12, 2015.  (R. 510.)  Physical examination showed that lumbar paraspinal muscles were tender in multiple locations and lumbar range of motion was moderately to significantly restricted in all planes.  (R. 510.) Dr. Fernandez noted that Plaintiff's gait was steady and her extremities were intact and well-perfused with moderate peripheral edema.  (*Id.*)  He assessed thoracolumbar pain and possible urinary incontinence, intermittent.  (R. 511.)  Given Plaintiff's complaints, Dr. Fernandez thought it reasonable to check a thoracic

10

spine MRI.  (*Id.*)

Plaintiff saw Dr. Fernandez again on December 31, 2015.  (R. 585.)  He recorded that Plaintiff had about three to four months of increasing back and leg pain. (*Id.*)  She reported that her "legs give out" and the pain was constant.  (*Id.*)  He noted that the MRI which had been recommended was denied by her insurance.  (*Id.*)  Dr. Fernandez's physical exam findings included the following: steady and independent gait; generalized tenderness about her lumbar paraspinal region; no midline tenderness; moderately restricted lumbar range of motion; good range of motion of her hips and knees; 5/5 lower extremity strength; lower extremity sensory exam intact to light touch and pain; moderate lower extremity peripheral edema; positive right straight leg raise; and normal peripheral vascular exam.  (*Id.*)  Dr. Fernandez assessed chronic low back pain and lumbar stenosis with radiculopathy.  (*Id.*)  He again suggested a lumbar spine MRI which was scheduled for January 6, 2016.  (*Id.*)

Plaintiff went to the Pinnacle Health Emergency Department on February 7, 2016, complaining of right side numbness and tingling and intermittent headache for two days.  (R. 611.)  She also reported blurred vision, right sided chest pain, back pain, neck pain, spasms, paresthiesias, and anxiety.  (*Id.*)  Physical exam included findings that Plaintiff was very anxious and fearful, her heart rate was tachycardic, right-shoulder range of motion was limited, and she resisted movement of the right arm due to pain.

(R. 613.)  Plaintiff later had full range of motion of her right arm and her blood pressure and heart rate were coming down.  (R. 613.)  Plaintiff was discharged with directions to follow up with primary care provider as soon as possible and follow up with her doctor about back pain and blood pressure.  (R. 617.)

Plaintiff was seen at Hamilton Health on February 19, 2016, for ER followup.  (R. 602.)  Plaintiff reported that her pain was worse and physical examination showed tenderness to palpation and muscle spasm in her back, and her cervical spine showed abnormalities.  (R. 602-03.)  The assessment was neck pain, back pain, and essential hypertension.  (R. 603.)  The plan included referral for a neurosurgery consultation.  (R. 603.)

## 2.   **Mental Impairments**

In addition to the notations regarding anxiety and depression referenced in primarily physical impairment medical encounters, Plaintiff had specific mental health evaluation and treatment.

On February 5, 2014, the Bureau of Disabilities Determination referred Plaintiff for a Clinical Psychological Disability Evaluation.  (R. 458-61.)  Dawn G. Crosson, Psy.D., conducted the evaluation.  (*Id.*)  By history, Plaintiff reported that she had struggled with depression and anxiety since she was thirty and her symptoms worsened after being injured in 2010.  (R. 458.)  Plaintiff said she felt hopeless, she had suicidal ideations, she was anxious and nervous, she worried excessively about her

finances, and she had panic attacks several times per day that included difficulty breathing, heart palpitations, racing thoughts, and trembling. (*Id.*) Plaintiff denied a history of mental health treatment and indicated she was not receiving mental health treatment at the time. (R. 459.) Dr. Crosson recorded the following Mental Status:

> Ms. Slaughter was neatly and appropriately dressed. She gave reasonable eye contact and rapport was established. Ms. Slaughter's mood and affect appeared sad and sullen. She cried throughout the interview. Ms. Slaughter's rate of speech was normal. There was no evidence of speech impairment.

> Ms. Slaughter was able to sustain attention and concentration. She was able to complete simple counting and calculation tasks. She was able to count to 10 and complete basic multiplication tasks. She was able to immediately recall 3 of 3 objects and she also able [sic] to recall the object after 5 mintures. Ms. Slaughter was able to complete 6 of the digits forward correctly but only 3 of the digits backwards correctly.

> Ms. Slaughter denied a history of homicidal ideations. She denied suicidal ideations on the day of the interview. She relayed that she thought about hanging herself approximately two weeks ago but didn't follow through because of her family and the recent suicide of her sister. Ms. Slaughter didn't appear to be a threat to herself on the day of the interview. There was no report of visual or auditory delusions.

(R. 459-60.) Dr. Crosson diagnosed Depressive Disorder NOS and Anxiety Disorder NOS. (R. 460.) She opined that Plaintiff's mental health prognosis may improve with psychotherapy and a

concurrent medication regime.  (*Id.*)  Dr. Crosson found that

Plaintiff's impairments had effects on functioning as follows:

> With regards to ability to perform activities of daily living, Ms. Slaughter is not able to dress or groom herself independently due to pain and she is prone to falling as she reported that her legs are weak.  She requires a companion when on outings and when shopping as she is unable to walk or stand for long periods.  She is unable to drive due to numbness and pain in her legs.
>
> Socially, Ms. Slaughter is isolated and withdrawn.  She is easily irritated and agitated.
>
> Regarding impulse control, Ms. Slaughter reported a history of property destruction and verbal aggression when angry.
>
> With regards to concentration, persistence and pace, Ms. Slaughter has difficulty retaining information and she is forgetful.
>
> Currently, Ms. Slaughter may be unable to sustain attention or pace to satisfactorily perform in an 8 hour work day/40 hours per work week.

(R. 461.)

On the same day, Dr. Crosson completed a Medical Source

Statement of Ability to Do work Related Activities (Mental).  (R.

462-64.)  She concluded that Plaintiff had moderate limitations in

her abilities to make judgments on simple work-related decisions,

understand and remember complex instructions, and carry out complex

instructions.  (R. 462.)  She concluded Plaintiff had marked

limitations in her ability to make judgments on complex work-

14

related decisions, interact appropriately with the public, supervisors, and co-workers, and respond appropriately to usual work situations and to changes in a routine work setting. (R. 463.) Dr. Crosson attributed the limitations to Plaintiff being overwhelmed from her symptoms (noting that "she cried throughout the interview"), she had suicidal ideations, and she had difficulty managing her pain. (R. 463.)

Records from Hamilton Health Center's Philhaven indicate that Plaintiff received outpatient services from July 29, 2014, to August 6, 2015. (R. 534-53.) She received counseling from Joyce McFadden who regularly reported that Plaintiff was in a lot of pain. (*See*, *e.g.*, R. 536, 538, 539, 540.) Plaintiff was evaluated by a physician at Philhaven on October 10, 2014, on referral of Joyce McFadden because her depression and anxiety were deepening and Plaintiff felt helpless about getting better. (R. 507.) She was diagnosed with mood disorder secondary to general medical condition. (*Id.*) In November, Plaintiff reported to Ms. McFadden that she felt better since she started on Cymbalta. (R. 534.) Plaintiff was seen by Robin Miller, M.D., on November 13, 2014, for a medication check. (R. 545.) Dr. Miller reported moderate depression, moderate anxiety, and moderate chronic pain. (*Id.*) She noted normal muscle strength and gait. (*Id.*) Mental Status Exam was normal in all identified categories. (R. 546.) On May 14, 2015, Dr. Miller noted moderate depression and anxiety and

severe chronic pain. (R. 551.) She again found Plaintiff to have normal muscle strength and gait as well as normal Mental Status Exam. (R. 552.) Dr. Miller recorded the same findings on August 6, 2015. (R. 548-49.)

### 3. **State Agency Consultant Opinion**

Thomas Fink, Ph.D., a State agency psychological consultant, completed a Psychiatric Review Technique ("PRT") on February 28, 2014. (R. 119-20.) He concluded that Plaintiff had mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace, and no repeated episodes of decompensation, each of extended duration. (R. 120.) He also completed a Mental Residual Functional Capacity Assessment and opined that Plaintiff was not significantly limited in the following areas: the ability to carry out short and simple instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; the ability to sustain an ordinary routine without supervision; the ability to work in coordination with or in proximity to others without being distracted by them; the ability to make simple work-related decisions; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to ask simple questions or

request assistance; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers; and the ability to maintain socially appropriate behavior. (R. 123, 24.) Regarding social interaction, Dr. Fink summarized that Plaintiff could "be friendly and cooperative[,] she retain[ed] the ability to relate and communicate well, travel in the community and make scheduled appointments." (R. 124.) Dr. Fink noted that, at the time of his evaluation, Plaintiff had no history of hospitalizations, she was not involved in outpatient mental health treatment, and she was not taking psychotropic medications. (*Id.*)

**B.** ***Hearing Testimony***

Plaintiff testified at the January 26, 2016, hearing before ALJ Staller that she was in constant pain from her lower back to her neck and she had pain down her legs into her feet. (R. 41-42.) She also said she used a cane prescribed by Dr. Williams because her legs gave out on her, especially when she had spasms. (R. 42.) She added that her legs went numb if she stood for a long period of time and she also had swelling in her legs, feet, and right arm. (R. 42-43.) When asked about a job that would allow her to sit for about six hours a day, Plaintiff said she would be unable to do that because it would be too much pressure and that's when her spasms got bad, she would get shooting pain down her legs, and she would have increased swelling. (R. 52.) Regarding depression,

17

Plaintiff said it affected her ability to focus, caused her mind to race, and affected her sleep. (R. 43.) She testified that the pain and depression would interfere with her ability to concentrate if she were working because she would be unable to focus. (R. 54.)

Plaintiff indicated that a friend prepared her meals, helped her dress and bathe, and did her housework and grocery shopping. (R. 45-46.) Plaintiff testified that she was no longer able to drive due to the medication she was taking. (R. 39-40.) She said her medications made her drowsy and "a little out of it." (R. 49.)

The ALJ gave the vocational expert ("VE") several hypotheticals, limiting the individual to sedentary work with added restrictions. (R. 57-59.) The VE determined that the individual would not be able to return to Plaintiff's past work but the individual identified in the first hypothetical could perform jobs that existed in significant numbers in the national economy. (R. 58.) If that person were off task more than fifteen percent of the workday or missed two or more days per month, the VE testified that there would be no jobs available. (*Id.*) Upon questioning by Plaintiff's attorney, the VE testified that if the individual were limited to sitting less than two hours per day, carrying less than five pounds at a time, and could not stoop or bend, the jobs previously identified would be eliminated. (R. 59-60.)

At the close of the hearing, Plaintiff's attorney renewed his request for a consultative examination. (R. 60.) ALJ Staller said

18

he would make his decision about the examination once all the records were in the file which he would leave open until February 5, 2016.  (*Id.*)

**C.   *ALJ Decision***

In his March 29, 2016, Decision, ALJ Staller concluded that Plaintiff had the severe impairments of degenerative disc disease of the lumbar spine, diabetes mellitus, hypertension, depressive disorder, and anxiety disorder.  (R. 13.)  He further concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (*Id.*)  ALJ Staller determined that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work

> except the claimant can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and never climb ladders, ropes, and scaffolds.  The claimant is able to understand, remember, and carry out simple instructions, and make judgments on simple work-related decisions.  The claimant can respond to usual work situations and to changes in a routine work setting.  She can interact appropriately with the public, coworkers, and supervisors in a routine work setting.  The claimant is able to maintain attention and concentration for two-hour segments over an eight-hour period.  The claimant can complete a normal workweek without excessive interruption from psychologically or physically based symptoms.

(R. 16.)  Based on vocational expert testimony, the ALJ found that Plaintiff was unable to perform her past relevant work but jobs

existed in the national economy which she could perform.  (R. 22-23.)  On this basis, he determined that Plaintiff was not disabled within the meaning of the Act through the date of the Decision. (R. 24.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[2]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment

---

[2]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that jobs existed in significant numbers in the national economy which Plaintiff could perform. (R. 23.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to

support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision.  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d

Cir. 2000) (citations omitted).  If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by

substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

As set out above, Plaintiff asserts the Acting Commissioner's determination is error for the following reasons: 1) the ALJ did not properly evaluate the opinion of the consulting psychologist; 2) substantial evidence does not support the ALJ's RFC assessment; and 3) the ALJ made multiple errors in evaluating Plaintiff's symptoms. (Doc. 9 at 1-2.)

### A.   *Consulting Psychologist Opinion*

Plaintiff asserts the ALJ did not properly evaluate Dr. Crosson's opinion for several reasons. (Doc. 9 at 10-13.) Defendant responds that the ALJ properly afforded little weight to the opinion because it was inconsistent with substantial evidence of record. (Doc. 10 at 8.) The Court concludes Plaintiff has not satisfied her burden of showing that error on the basis alleged is cause for reversal or remand.

ALJ Staller assigned little weight to the opinion for several reasons. (R. 21.) After noting that Dr. Crosson opined that Plaintiff may have been unable to sustain attention, concentration, or pace to satisfactorily work eight hours a day, forty hours a week, and further noting Dr. Crosson's determination that Plaintiff had certain marked impairments, ALJ Staller stated that he gave

> the opinion little weight as it is generally inconsistent with the claimant's stable treatment for her depression and anxiety. The undersigned notes that during her counseling with Philhaven in 2014 and 2015, she generally had stable symptoms, and even reported improvement with Cymbalta (Ex. B18F). The undersigned finds that based on this stability, and her lack of noted depression and anxiety during medical examinations, Dr. Crosson's opinion of the claimant's functioning is inconsistent with the medical evidence of record. Further, as to her finding the claimant might not be able to work full-time, the finding of a claimant's disability is one of the issues reserved to the Commissioner of the Social Security Administration (20 C.F.R. 404.1527(e)(1); SSR 9605p). As to the GAF of 39, this is grossly inconsistent with the consultative examination as it indicates a severe restriction in functioning, and the claimant performed well on testing during this examination. Therefore, the undersigned gives this opinion little weight.

(R. 21.)

Plaintiff first states that the ALJ's decision to assign little weight to Dr. Crosson's opinion was based "primarily on the ground that it was inconsistent with the claimant's stable treatment for her depression and anxiety. (Tr. 21) But, having a

25

stable condition does not indicate lack of a disabling condition. *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000)." (Doc. 9 at 10.) The Court concludes this is a mischaracterization of the ALJ's assessment in that Plaintiff's conclusory statement regarding stability does not address the specific records at issue here and the findings set out above indicate that the stability of Plaintiff's symptoms was just one of many reasons cited by ALJ Staller. (*See* R. 21.)

First, Plaintiff does not deny that Philhaven records support a finding of symptom stability. Second, Plaintiff does not acknowledge that the ALJ's citation generally to Philhaven records (Ex. B18F [R. 534-53]), includes Mental Status Exam findings on multiple occasions where "Normal" findings were recorded in all categories by Dr. Miller. (*See* R. 546, 552, 549.) These examination findings undermine Plaintiff's inference that her stable condition does not indicate lack of a disabling condition-- certainly, "normal" Mental Status Exam findings indicate lack of a disabling condition. (*Id.*) Further, Plaintiff does not acknowledge that ALJ Staller also concluded that Dr. Crosson's opinion of Plaintiff's functioning was inconsistent with the medical evidence of record based on Plaintiff's "lack of noted depression and anxiety during medical examinations." (*See* R. 21.) Plaintiff points to no medical evidence from a treating provider contradicting the records relied upon by ALJ Staller. (*See* Doc. 9

at 10-13.)  Thus, despite her conclusory assertions regarding what the ALJ could have or should have done (*id.*), Plaintiff has not shown that the ALJ's assessment of Dr. Crosson's opinion is not supported by substantial evidence.  Therefore, Plaintiff has not satisfied her burden of showing that the Commissioner's decision must be reversed or remanded on the basis alleged.

## B. Residual Functional Capacity Assessment

Plaintiff contends the RFC was incomplete because ALJ Staller did not specify Plaintiff's ability to sit, stand, walk, lift or carry, and her use of a cane.  (Doc. 9 at 13-14 (citing SSR 98-6p).)  Defendant responds that the ALJ properly accounted for limitations related to sitting, standing, walking, lifting, and carrying by finding her capable of sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(1).  (Doc. 10 at 5 (citing R. 16).)  Defendant also asserts that the ALJ did not err in his consideration of Plaintiff's use of a cane.  (Doc. 10 at 6-7.)

Plaintiff does not refute that the ALJ's restriction to sedentary work inherently addresses the limitations noted as both the relevant regulations and SSR 96-9p cited by Defendant (Doc. 10 at 5) encompass a claimant's ability to sit, stand, walk, lift, and carry.  (*See* Doc. 11.)  Therefore, Plaintiff has not shown that this claimed error is cause for reversal or remand.  Plaintiff's claimed error regarding ALJ Staller's consideration of her use of a cane will be addressed below.

## C.   *Symptom Evaluation*

Finally, Plaintiff asserts the ALJ's symptom error evaluation compels reversal. (Doc. 9 at 14.) She first maintains that the ALJ found Plaintiff's allegations regarding subjective complaints "not entirely credible" but, when the Decision was issued, the use of the term "credibility" had been eliminated from SSR addressing symptom evaluation. (Doc. 9 at 14 (citing R. 17, 24).) Substantively, SSR 16-3p's guidance concerning the evaluation of subjective symptoms in disability claims is largely consistent with the policies set out in SSR 96-7p regarding the assessment of the credibility of an individual's statements. *See*, *e.g.*, *Sponheimer v. Comm'r of Soc. Sec.*, Civ. No. 15-4180, 2016 WL 4743630, at *6 n.2 (D.N.J. Sept. 8, 2016). Therefore, although SSR 16-3p states that the SSR is effective on March 28, 2016, 2017 WL 5180304, at *13, and the decision at issue here is dated March 29, 2016, the ALJ's citation does not present a basis for finding harm related to the claimed error.

Regarding the ALJ's finding that Plaintiff's neurological testing was "generally normal," Plaintiff cites SSR 16-3p to support the proposition that "an ALJ may not discredit testimony of a claimant's symptoms solely because there is no medical evidence to support it." (Doc. 9 at 15.) While the general proposition is true, the ALJ did not discredit Plaintiff's symptoms solely on the basis alleged but cited several reasons for his conclusion that her

symptoms were not fully supported by the evidence of record. (*See* R. 20-21.)

Plaintiff also asserts that the ALJ did not conduct a proper pain analysis pursuant to 20 C.F.R. § 416.929(c)(3) and SSR 16-3p and he should have considered her limited daily activities and medication side-effects while evaluating the limiting effects of her symptoms. (Doc. 9 at 16.) Plaintiff specifically cites the following: statements about activities of daily living, including Plaintiff's statements concerning the need for help with dressing, bathing, and cooking; her medications cause drowsiness and dizziness; and her conditions affect her ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, and her ability to complete tasks and concentrate. (Doc. 9 at 16 (citing R. 243, 247, 249).)

Defendant responds that the ALJ appropriately evaluated Plaintiff's subjective allegations. (Doc. 10 at 19-20.) Defendant agrees generally that activities of daily living and medication side effects are relevant factors to be considered pursuant to SSR 16-3p. Regarding activities of daily living, Defendant states

> the ALJ noted that, in contrast to Plaintiff's claims of completely disabling pain and limitations, she testified to an ability to prepare simple meals such as sandwiches, television dinners, and salads; did laundry and some light cleaning; shopped; and drove a car (Tr. 242-48, 309, 312). Such activities belied allegations of disabling pain.

(Doc. 10 at 21.)  Defendant's citations are to Plaintiff's Function Report and her friend's Third Party Function Report.  Although Defendant does not provide a citation to where the ALJ's notation is found in his Decision, the Court assumes Defendant refers to ALJ Staller's explanation of his determination that Plaintiff had mild restrictions in activities of daily living in the context of his step three analysis of whether Plaintiff met the "paragraph B" criteria of listings 12.04 and 12.06.  (R. 15.)  His entire discussion of the issue follows:

> In her function report, the claimant indicated she needed help at times to dress and bathe due to a fear of falling (Ex. B2E/2 [R. 243]).  She indicated she could make simple meals such as sandwiches, television dinners, and salads when needed (Ex B2E/3 [R. 244]).  Further, she stated she helped with cleaning and laundry once a month (Ex. B2E/3 [R. 244]).  During her psychological consultative examination, the claimant indicated she needed help with dressing due to her physical weakness (Ex. B7F/4 [R. 461]).  In a report of her daily activities, the claimant reiterated she could cook easy meals, but sometimes needed help with her personal care due to physical weakness (Ex. B3E/2 [R. 254]).  At the hearing, the claimant indicated she can no longer do housework due to pain.  Overall, the claimant's initial statements demonstrate she can perform some basic activities such as preparing meals for herself.  While she testifies about extensive limitations in this area, they are primarily related to her physical pain.  Therefore, the undersigned finds the claimant has mild restriction in this area.

(R. 15.)  At the close of his step three discussion, ALJ Staller

stated that

> [t]he limitations identified in the
> "paragraph B" criteria are not a residual
> functional capacity assessment but are used
> to rate the severity of the impairments at
> steps 2 and 3 of the sequential evaluation
> process.  The mental residual functional
> capacity assessment used at steps 4 and 5 of
> the sequential evaluation process requires a
> more detailed assessment by itemizing various
> functions contained in the broad categories
> in paragraph B.

(R. 16.)   Although ALJ Staller concludes with the statement that

"the following residual functional capacity assessment reflects the

degree of limitation the undersigned has found in paragraph B,"

(*id.*), no discussion of activities of daily living is found in his

RFC analysis.  (*See* R. 16-22.)   Thus, the RFC explanation lacks the

required "more detailed assessment . . . itemizing various

functions contained in the broad categories in paragraph B" (R.

16).   The Court cannot import the ALJ's step three analysis into

the RFC explanation because a "*more detailed assessment*" (R. 16

(emphasis added)) is required.   Moreover, the Court cannot conclude

that the error is harmless based on the ALJ's open-ended discussion

which acknowledges that Plaintiff reported increasingly limited

activities of daily living at the ALJ hearing and the ALJ related

the "extensive limitations" primarily to physical pain.   (R. 15.)

On this basis, the Court concludes remand is required.

Regarding medication side-effects, Defendant notes that the

record fails to document disabling or even severe side effects from

medication to warrant a more restrictive finding. (Doc. 10 at 21.)
Defendant cites *Schmidt v. Comm'r of Soc. Sec.*, 465 F. App'x 193
(3d Cir. 2012), for the proposition that failure to explicitly
address the possible side effects of a plaintiff's current
medications can be harmless error, and *Burns v. Barnhart*, 312 F.3d
113, 130-31 (3d Cir. 2002), for the proposition that a side effect
of drowsiness is often associated with taking medications and
should not be viewed as disabling without record documentation of
serious functional limitations. (*Id.* at 21-22.) While Plaintiff
does not refute the applicability of these propositions to her case
(*see* Doc. 11), because remand is required on the basis set out
above, further symptom evaluation should encompass medication side
effects and other relevant factors identified in SSR 16-3p, 2017 WL
5180304, at *7-8.

Similarly, Plaintiff's alleged need for the use of a cane
should be further addressed. Plaintiff takes issue with the ALJ's
indication that she relied on the lack of a prescription for a cane
when no prescription is required. (*See*, *e.g.*, Doc. 9 at 14-15.)
Although Plaintiff does not address the ALJ's references to Dr.
Fernandez's findings that Plaintiff's gait was steady in March and
December 2015 (*see* R. 19, 22, 510, 585), other evidence of record
arguably indicates that Plaintiff experienced periodic gait
instability for which a cane was medically indicated (*see* R. 42,
486, 489). Therefore, because remand is required, this issue

should also be addresssed.

## V. Conclusion

For the reasons discussed above, the Court concludes Plaintiff's appeal is properly granted in part. This matter is remanded to the Acting Commissioner for further consideration consistent with this opinion. Specifically, the Residual Functional Capacity Assessment is to include symptom evaluation consistent with SSR 16-3p, 20 C.F.R. §§ 404.1529 and 416.929(c)(3). An appropriate Order is filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge


DATED: May 18, 2018